(SUPREME COURT.)

Cortelyou *against* Lansing, administrator of Antill.

On the deposit of a pledge, where no day of redemption is limited, the right of re-demption de-scends to the personal repre-sentatives of the pawnor; if the pawnee sell the pledge be-fore application to redeem, he is answerable for the value of the pledge at the time of the ap-plication, and it is not necessa-ry in such case to make an ac-tual tender of the balance due.

THIS was an action of assumpsit, under the fol-lowing circumstances. On the 29th *April*, 1786, *Antill* deposited with the defendant a depreciation note, taking from him a receipt in these words:—

" Received of *E. Antill*, as a deposit, to remain in my hands his depreciation note, dated 1st *January*, 1781, No. 26, said to be for the value of 2,629 dol-lars and 48 cents, which note is to delivered up upon the payment of 600 dollars, with lawful interest, lent and advanced by me to the said *E. A.* on the 24th *September*, 1783, or upon giving such other secu-rity as will be acceptable for the whole, or such part as may be found due upon a future settlement."

On the 1st *January*, 1785, the defendant received on account of the 600 dollars, 125 dollars, and on 9th *October*, 1788, he sold the certificate for 625 dollars being the highest market price that could

be obtained for the same, leaving a balance of 39 dollars and 62 cents due to him on that day.

In 1791 or '92 *Antill* died, and administration being granted to the plaintiff, he, in 1799, went to the house of the defendant, for the purpose of demanding the certificate, but in consequence of the defendant's incapacity to attend to business, from mental derangement, he could not be seen. There was no evidence that the plaintiff had any money at the time to tender to the defendant.

At the trial, the court charged the jury on this evidence, that the demand of damages was a question of law, but that the plaintiff was entitled to recover ; and, that the only rule of damage was the value of the certificate in 1799, together with interest from that time. The jury found accordingly, subject to the opinion of the court on the above case.

*Per Curiam*, delivered by KENT, J. The points relied on by the defendant are,

1.    That he had a right to dispose of the certificate.

2.    That the pledge had become absolute by the death of the pawnor.

3.    That a tender of the money was requisite before suit.

4.    That the rule of damages was subject to the discretion of the jury.

The two first questions raised in this case, respect the rights of the parties over the depreciation note thus deposited with the defendant ; the one claiming a right to redeem, and the other to sell it ; each reciprocally denying the other's pretensions. But the

C c

ALBANY.

Cortelyou
v.
Lansing.

books involve the inquirer in considerable doubt and difficulty in the discussion of these questions, nor do the English courts appear to have defined and settled them with their usual accuracy and precision.

The note in question came under the strict definition of a pledge.* It was delivered to the defendant with a right to detain, as a security, for his debt, but the legal property did not pass, as it does in the case of a mortgage, with a condition of a defeasance.—— The general ownership remained with the intestate, and only a special property passed to the defendant. It is, therefore, to be distinguished from a mortgage of goods, for that is an absolute pledge, to become an absolute interest if not redeemed at a fixed time. Besides, delivery is essential to a pledge ; but a mortgage of goods is, in certain cases, valid without delivery.

*Dig. lib. 13. tit. 7. § 9. 1 Hub. 291. § 15—— Brooke's Abr. tit. Ple ges, 20. 2 Vezev, jun. 378. 1 Powell on Mort. p. 3.—— Bracton, 99. b.

The mortgage and the pledge, or pawn of goods seem, however, generally to have been confounded in the books, and it was not until lately, that this just discrimination has been well attended to and explained.

I find no difficulty in saying that the defendant had no authority to sell the pledge at the time he sold it. It was, at that time, an illegal conversion of the intestate's property. The pledge was delivered without any specified time of payment or redemption.—— It was to remain in the defendant's hands to be delivered upon payment. The cases relied on by the defendant's counsel admit, that in such a case, the pawnor has his whole life-time to redeem. If this be so, the defendant had no right to sell during the pawnor's life ; because the one right would be inconsistent with the other. The expression, however,

that the pawnor has his life, as a time to redeem, where no time of redemption is fixed, must be taken with this qualification, that the defendant does not, in the mean time, call upon him to redeem.

This he certainly must have a right to do. The manner in which that call is to be made, and, in case of the pawnor's default, the manner of disposal of the pledge, are distinct points which I need not now discuss ; because, in the present case, no call whatever was made upon the intestate, previous to the sale of the note. There is no instance to be found, in case of a deposit, for an indefinite time, where the pawnee sold in the life-time of the pawnor, and without making a previous demand, that such sale was held good. The sale by the defendant was, therefore, clearly unauthorised and illegal.

The next, and the more difficult question is, whether the representatives of the pawnor have a right to call upon the defendant to restore the pledge or its equivalent. That the intestate had such a right is not to be disputed, and the point is, whether it be such a right of action as died with the person, or whether, as in all other cases of a right in action, not founded on a personal tort, it descended to the plaintiff. If the right of action did not descend, this will be the first case, I apprehend, that ever existed, in which the remedy for the conversion of one's property, was limited to the life-time of the party injured. But it is said to be immaterial, what was the defendant's conduct in respect to the pledge, since where no time was fixed, the pawnor must redeem in his life-time, and if he dies without redeeming, the property in the pledge becomes absolute in the

ALBANY.

Cortelyou
v.
Lansing.

pawnee. This last proposition has so much coun-
tenance in the books, that to determine on its valid-
ity it will be necessary to bestow a considerable at-
tention to the cases, and if I am not greatly mistaken,
the result will show that it is wholly destitute of any
solid foundation.

Glanvil, the earliest of our juridical classics, has
treated the subject with a precision not to be found
in the authorities of a subsequent period, and with a
perspicuity and simplicity that bespeak a writer

*Glanvil, lib.10. of a primitive age.  A loan* he observes, is some-
c. 1. p. 59. times made on the security of a pledge (*sub vadii po-
sitione*) and the pledge may consist of chattels, lands

†1 Reeves, 161. or rents.†  Sometimes, possession is immediately
given of the pledge, on receipt of the loan, and
sometimes it is not.  Sometimes the thing is pledged
for a term, and sometimes without.  When a chat-
tel is pledged and possession is given, and for a cer-
tain term, the creditor is bound to keep the pledge
safely, and not to use it to its detriment.  If it be
agreed that in case the debtor should not redeem the
pledge at the end of the term, the pledge shall re-
main with the creditor as his own property, the agree-
ment must be observed.  But if there be no such
agreement, and there be a fixed time of redemption,
and the debtor make *delay* in payment, the creditor
may quicken the redemption by a writ (of which he
gives the form) and which requires the debtor with-
out delay to redeem (*acquietet rem quam invadiavit*)
the pledge.

On the return of the writ, if the defendant
confessed the pledge,‡ he was commanded to re-
‡ Ib. 162. deem in a reasonable time, and on default, the

creditor had license to treat the pledge as his own.——
But if the pledge was made without mention of any
particular term,* the creditor might (*debitum petere*)
demand his debt at any time and the debt being dis-
charged, the creditor was bound to restore the pledge
without any deterioration.

This authority establishes two points.

1st. That if the pledge was not redeemed by the
time stipulated, it did not then become absolute pro-
perty, in the hands of the pawnee, but the pawnee
was obliged to have recourse to the *aula regis*, and
to sue out an original writ, in order to obtain authori-
ty to dispose of the pledge.

2d. That if the pledge was for an indefinite term,
the creditor might, at any time, call upon the debtor
to redeem by the same process of demand. By what
authority the judges in the time of *James I.* advanced
a different doctrine on the subject, is not made to ap-
pear. The rights of the parties arising out of the
case of a pawn, underwent, however, a considera-
ble discussion in three several cases during that
reign.

In the case of *Mores* v. *Conhem,** 7 *J. I.* in C. B. it
was resolved by the court, that a pawnee had a *spe-
cial property* in the goods pawned, and might use
the pawn, so that it was not to its detriment, and if
he *assigned* over the pawn, the assignee would be
subject to detinue, if he detained the pawn after pay-
ment by the owner.

This decision was correct, and in harmony with
the ancient laws, as laid down by *Glanvil and Brac-
ton.*† It considered a pawn in its true light, as a
mere deposit of a chattel to be detained as a secu-

ALBANY.

Cortelyou
v.
Lansing.

* 1 *Reeves,* 163.

* *Owen, p.* 123.

† *Glanvil ut su-
pra, Bracton,*
99 *b.*

rity, and that the general property was still in the pawnor.

The next case is, that of *Sir John Ratcliffe* v. *Davis*, 8 *J. I.* in K. B. That was a suit in trover, and the special verdict stated, that the plaintiff had pawned a hat-band, set with jewels, unto one *Whitlock*, a *goldsmith*, for 25*l.* no day was set to redeem. The pawnee on his death-bed, delivered the pledge to the defendant, with a request to keep it till the money was paid, and then to deliver it to the plaintiff. The pawnee then died, and the plaintiff tendered the debt to his executor, who refused to receive the money, and then he applied to the defendant, and after a demand and refusal, brought his suit. The court gave judgment for the plaintiff; and of course decided all the points arising out of the verdict, which were, that the tender to the executor, was well made; that by the tender and refusal, the special property in the pledge, revested in the plaintiff; that the general property had been constantly in him; that the death of the pawnee did not destroy the right of redemption; that refusal by the defendant after tender to the executor, was a conversion, and that the defendant had only the bare custody of the pawn.

This decision was in every respect reconcileable with the ancient law. It maintained without diminution, all the well known and settled rights of the respective parties; and had not the erudition of the judges (according to the taste of those times) carried them far beyond the record before them, and led them to discuss points, not relevant to the issue, we should, probably, never have heard of the present question.

But in giving their opinions, one of the judges said, that executors might redeem a pledge, and that it would be assets in their hands. The other four observed, that if time be limited to redeem, the death of either party previous to the time, could not prejudice the right; but if no time was limited, the pawnor had his whole life, and if he died before he redeemed, the right was gone, and his executors could not redeem. It were to be wished, that the reasons of the judges had been more fully reported than we find them in this case.

In the case as reported in *Bulstrode*, the only reason stated is, that it would be very mischievous to compel the pawnee to keep the goods thus pawned, for such an indefinite time, when he hath paid sufficiently for them. But this objection would have been found to have had no validity, if they had only attended to the law as laid down by *Glanvil*, who says, as I have already stated, that where no time is fixed, the creditor might quicken his debtor's delay, and demand his debt at any time, the process for which he has given. From the case as reported in *Croke*, it is very questionable whether the court ever agreed in these extrajudicial *dicta*. He states that two of the judges held, that redemption could not be made after the death of the pawnor; for he, at his peril, ought to redeem in his time, as it is upon a mortgage; but that the others (and who were the majority) held otherwise, for that pledging doth not make an absolute property as in the case of a mortgage of land; but it is a delivery only until he pays, &c. So it is a debt to the one and a retainer of the thing to the other, for which there may be a re-de-

mand at any time upon the payment of the money as the pawnee hath but a special property in the goods, to detain them for his security.

In *Yelverton* and *Noy,* the opinion of the court is, however, given as it is in *Bulstrode,* and the reason stated is, that the pledge is a condition personal, and extends only to the person of him, who pawned it.— Supposing, then, this to be the more correct report of the case, the ground of the opinion is equally un_sound; a pledge is not a property created upon a con- dition of defeasance like a mortgage. It has no ana- logy to the case of a *right* which is absolute to vest, or to be defeated on the *happening of an event,* nor is it susceptible of that strict construction, unless it be so modified by the express agreement of the parties. Least of all is it a condition personal, to be perform- ed exclusively by the pawnor. There is nothing of this in the nature of the contract, and in most cases, as when the time of payment is mentioned, it is agreed, that the right may remain perfect in the representa- tives of the parties.

* 2 *Co.* 79. the
*ord Cromwell's*
case. *Dy.* 139 *a.*

In feoffments of land, upon condition that the feof- fee do an act, and no time be limited, there he hath only his life-time; but if his *heirs* be mentioned, the condition is not broken by his death; but extendeth to his heirs indefinitely without limitation of time, and cannot be broken except upon request made by the feoffor or his heirs.

If the naming of the heirs would, in this case, do away the limitation of this condition to the person of the feoffor, even according to the rigid construction that used to prevail, under the genius of the feudal

law over feoffments upon condition, surely it cannot be material that in personal contracts the executor should be named, for it is a general and well established principle, that they are affected equally as if named.

This notion of a pledge, resting upon the performance of a condition, to revest the right as in the case of a mortgage, probably led to the decision in *Capper* v. *Dickinson*, K. B. 13 Ja. 1.* That if goods pawned for a time limited, be not redeemed at the day, they are forfeited and may be sold at the will of the pawnee.

[* 1 *Rol. Rep.* 315.]

This doctrine is also held by justice *Dodderidge*, in his office of executors, he says the pawnee may dispose of it at his pleasure.† This last decision not having any direct application to the present case, may be passed over without much notice. It is contrary to the contract of pledge, which does not pass any absolute interest, nor rest on any absolute condition. It is, as we have seen, repugnant to the ancient law, and it is contradicted by a late authority. *Comyns*,‡ who is of himself a great authority, says, that if a man pledge goods for money lent, he may redeem, though he does not come at the day ; and the practice has since become familiar.

[† 1 *vol.* 76. 81.]

[‡ *Dig. tit.* mortgage by pledge of goods, *b.*]

By the *lex commissoria*§ at *Rome*, it was lawful for the creditor and debtor to agree, that if the debtor did not pay at the day, the pledge should become the absolute property of the creditor. But a law of *Constantine*, contained in the *code*, abolished this as oppressive, and with marks of indignation, declared that the memory of the former law ought to be abolished to all posterity. Such a rigorous decision as that in *Rolle*, is contrary to the law of *France*; of

[§ *Code, lib.* 8. *tit.* 35. *ch.* 3. 3 *Hub.* 1038. *sec.* 17. 1 *Domat.* 362. *sec.* 11.]

D d

ALBANY.

Cortelyou
v.
Lansing.

of *Holland*, of *Scotland*, and, probably, of all other countries which have felt and obeyed the influence of the civil law ; and if it were really a part of the English code, in this instance also, we might say of these people, that they were truly " *toto divisos orbe*" by their laws, as well as by their situation.

There remains only an extrajudicial dictum of C. J.

* 1 Ld. *Raymond,* 434.
† 1 *Vez.* 278.

*Treby,** and another of lord *Hardwicke*,† and both supported only by the case in *Bulstrode*, which go to show that a pawn is not redeemable after the death of the pawnor, and these are all the authorities, as far as I have been able to discover, on which the whole proposition has rested.

In the chancery cases of *Tucker*, administrator, &c. v. *Wilson*, in 1714, and *Lockwood* v. *Ewer*, in 1742, and *Kemp* v. *Westbrook*, in 1749, it was said, that a pawnee of stock was not bound to bring a bill of foreclosure, and might sell without it. But in the two first cases, the stock had been, in the first instance, *absolutely transferred* to the mortgagee with a defeasance thereto, that the assignment should be void, or the stock retransferred on payment at the day. They were cases, therefore, not of a pledge but of a mortgage of goods, and although it is no where stated, in what manner the mortgagee is to sell, yet, in the first of these cases, there was a previous notice to the opposite party, according to the rule of the civil law, and the giving of this notice, was asserted to be the constant practice. The last case was strictly a pledge of chattels to secure a loan, without a specified time of payment ; and the assignee of the pawnor who had become a bankrupt, was allowed to redeem. This case has, therefore,

no further connexion with the present question, than to show that where no time is fixed, an assignee is competent to redeem.

The two cases of *Demandray* v. *Metcalf*, in 1715, and of *Vendezee* v. *Willis*, in 1789, are cases of pledge, and perfectly in point in favour of the plaintiff. In the one case, there was a pawn of jewels, and in the other of bonds and securities. In both cases, the time of payment had elapsed, in the life of the pawnor; he died, and the executors, on a bill to redeem on payment of the debt and interest, obtained a decree accordingly. It is said, indeed, in the first case, that the executors could not have back the jewels, without the assistance of chancery.

If by this was meant the identical chattel pawned, it was, perhaps, correct; but if the observation meant that the executors had no remedy but in equity, it must be a mistake ; for a court of law has complete jurisdiction over the subject, and is equally competent to grant relief where the right of property is not extinguished. It would be unreasonable to turn the plaintiff round to another forum, when there are no technical difficulties to impede, nor any defect of authority to give him redress *here*, by restoring to him, if not the specific thing, yet its equivalent.- If a court of law will permit the one party to demand his debt after the time, it will equally permit the other party to tender and redeem.† In the case of the *South Sea Company* v. *Duncomb*, K. B. 5 G. II. it was decided, that where the pawnor of stock did not pay at the day stipulated, the pawnee had his election to sue for the debt, or *to stand to his remedy*

\* *Prec in chan* 4:0 2 *Vern.*691: 698. 1 *Eq Ca-Abr.* 324 *Gilb. Eq. Rep.*104, 3 *Bro.*21.

† *Str.*91?

*against the pawn.* The court did not state the re-
medy, but still there was to be a remedy under the
sanction of law, and the only remedies hitherto sug-
gested in the books, are the process by writ, as stat-
ed in *Glanville ;* the bill of foreclosure, as hinted in
other cases, and the sale by the pawnee, after notice,
in cases of the transfer of stock, as seems to have
been the practice.

· From this review of the cases, I conclude, that
whatever right to redeem existed in the pawnor at
his death, that right descended entire and unimpair-
ed to his representative.    There are two decisions
fully to this effect, and there is not a decision to the
contrary, or one which establishes, that if no time
be limited to redeem a pawn, the right to redeem is
extinguished by the pawnor's death.

The several *dicta* in the courts which go thus far,
are founded on principles manifestly erroneous.——
They departed from the true nature of a pawn, which
was well understood in the Roman law, and well un-
derstood in the days of *Glanville* and *Bracton,* who
were, no doubt, greatly instructed by that inesti-
mable system of civil jurisprudence, although, with
respect to *Glanville* in particular, he wrote the Eng-
lish law of his time, without much, if any, adoption
·from the Roman.    The error consisted in applying
to pawns the severe feudal doctrine of absolute for-
feiture upon breach of a condition, whereas a pawn
is in no respect an estate resting upon condition..

It would be a doctrine the most intolerable and op-
pressive.    In one of the cases mentioned, a pawn
worth 600*l.* was deposited to secure a loan of 200*l.*
and if no time be mentioned, and the pawnee can

sell when he pleases, without first calling on the pawnor, or if the pawnor's right is gone by his sudden death, the law would establish a most disgusting speculation, infinitely more odious than the *lex commissoria ;* for that was founded upon express agreement. And although the executor may not redeem, the pawnee has still his election to sue, and the executor has not even the privilege of the equitable rule, *qui sentit onus debet sentire commodum.*

It may be well enough to observe, by way of illustration, that except in cases of special agreement, the Roman law never allowed a pledge to be sold by the creditor, but upon notice to the debtor, and the allowance of a year's redemption.* And as this was not sufficiently observed, *Justinian* regulated the method of foreclosure by a particular ordinance, by which two years notice or two years after a judicial sentence was allowed to the debtor.†

It was moreover a well settled rule in that law, that the creditor could never hold the pledge by prescription ; and that no length of time would preclude the debtor and his representatives from the right to redeem, and the reason given is very conclusive, because the creditor holds not as his own, but in another's right, " *alieno nomine possidet.*"‡ I believe there is no country at present, unless it be England, that allows a pledge to be sold but in pursuance of a judicial sentence.§

The third point raised in this case is as to the necessity of payment or tender of the money loaned

*Perezius on the Code. vol. 2. 62. tit. 34. sec. 4. 5. do. p. 58. Huberus, vol. 1. p. 157. sec. 2. vol. 3. p. 172. sec. 6.*

†*Inst. lib. 2. tit. 8. sec. 2. Dig. lib. 13. tit. 7. c. 4. Code, lib. 8. tit. 28. c. 4. and tit. 34. c. 1.*

‡*Dig. lib. 41. tit. 3. c. 13. Code, lib. 4. tit. 24. c. 10. See also Perezius, vol. 1. p. 267. sec. 12. 13. and 1 Domat. 368 sec 7. Huberus, vol 3. p. 1077. sec. 11. See also Halled's Gentoo Code, p. 118, which allowed a redemption after the debtor's death.*

§ *Huberus, vol. 3. 1072. sec. 6. and Perezius, vol. 2. 63. sec. 8. as to Holland and Brabant. Domat. vol. 1. 362. sec. 9, 10. and 2 Ersk. 455, as to France and Scotland.*

ALBANY.

Cortelyou
v.
Lansing.

*Kingston and
Preston, Doug.*
691. 4 *Durnf.*
464, 5. 1 *East,*
208. 5 *Viner,*
84, *in notis.*
*Turner v. Good-
win.*

previous to the commencement of the suit. The payment of the money and the return of the pledge were to be concurrent acts, to be performed by each party at the same time and place. Each must show a capacity and readiness to perform, and yet neither was to trust the other personally.——The one was not actually to part with his money, unless the other at the same time showed a capacity and readiness to return the pledge ; nor was the one to return the pledge until the other showed, at the same time, the like capacity and readiness to pay the money ; the acts being reciprocal, and one dependent upon the other.

But when one party has *incapacitated* himself to perform his part of the contract, there is no need of the other coming forward at the time to make a tender, or to show himself in a capacity to pay, because it would be a nugatory act which the law will never require.——If the one party *discharges* the other from a performance, by saying he will not perform on his part (and voluntarily and tortiously rendering himself unable to perform his part is equivalent to such discharge) it is well understood, that it is not necessary for the other party to go forward. This was so decided in the case of *Jones* v. *Barkley,** and the same principle has been frequently advanced in other cases ——In the case of *Judah,* &c. v. *Kemp,* decided in this Court, October Term, 1801.——The suit was in trover for goods ; the plaintiff proved property and a demand and refusal ; the defendant was master of a vessel and had a lien on the goods for freight; on demand he refused to deliver the goods, and said he had orders not to deliver them ; no tender of the freight, nor even a capacity to make one was shown ; the defendant did not object to deliver on that, but upon another ground. The only question raised was,

* Doug. 684.
Rawson v.
Johnson, 1
East, 208.

whether tender of the freight ought to have been made, and the Court decided that it was not necessary as the act would have been useless, and they gave judgment for the plaintiff.

The last question is as to the rule of damages.— If the direction of the judge was correct, or if the rule is to be given by the court, then the verdict is to stand, and to be made conformable to such rule. But if the damages are to be considered as in any degree subject to the discretion of a jury, a new trial is to be awarded.

There is no doubt but that the measure of damages is sometimes a question of law, but more frequently it is to be left at large to the discretion of a jury. In cases where there is a criterion for an accurate computation, that criterion must be followed, and it becomes, then, a rule of law.

The value of the depreciation note is the measure of damages in the present case; and the only question is, how that value is to be ascertained. If it is to be ascertained from the face of the note? or from what time is that value to be computed? There must be some rule or principle on the subject, and that principle, whatever it may be, is a question of law, and not of an arbitrary *ad libitum* discretion in the jury. A great part of our common law jurisprudence is only a collection of principles, to be selected and applied to particular cases, by the discernment and diligence of the courts. I have no doubt the rule in the present case is a rule of law, and the only examination is, to discover it.

The direction at the trial was, the value of the certificate in 1799, when the plaintiff went to make a demand. This must not be understood to mean,

that the cause of action arose then. From that ground the direction would have been erroneous. Putting out of view the previous sale, the plaintiff has not shown a cause of action by his act in 1799, for he ought at least to have shown, that he went with a readiness and a capacity to pay. The mental inability of the defendant, may have rendered him incapable of receiving an actual demand from the plaintiff, but it surely is not to be construed into a discharge to the plaintiff, from the performance of his duty, which was to come with a disposition and ability to perform his part of the contract ; that act of the plaintiff was, therefore, wholly immaterial as a ground of action, and if the value of the note is to be estimated from that date, it must be because the plaintiff manifested his will to have it then restored.

The value of the chattel, at the time of the conversion, is not, in all cases, the rule of damages in trover; if the thing be of a determinate and fixed value, it may be the rule, but where there is an uncertainty, or fluctuation attending the value, and the chattel afterwards rises in value, the plaintiff can only be indemnified by giving him the price of it, at the time he calls upon the defendant to restore it, and one of the cases even carries the value down to the time of the trial.

\* 3 *Burr.* 1363. 2 *Black. Rep.* 902. See also 6 *Durnf.* 696.

The cases of *Fisher* v. *Prince*,\* and of the administrator of *Hunt* v. *Fuller*, have long since settled, that if the chattel after the conversion increased in value, or be attended with other circumstances, the damages may be enhanced accordingly. And in the case of *Shepherd, executor, &c.* v. *Johnson*,† the defendant was sued for breach of contract, in not re-

† 2 *East,* 211.

placing a certain quantity of stock by a given day,
and the court held, as the direction had been to the
jury, that the plaintiff was entitled to recover, not
merely the value of the stock as it stood at the day,
but the value as it stood at the time of the trial. And
they said it was no answer to say, that the defendant
might be prejudiced by the plaintiff's delay in bring-
ing his action, for it was his own fault that he broke
his engagement, and he might replace the stock at
any time afterwards, so as to avail himself of a rising
market ; I have no doubt it is just and right that the
plaintiff in the present case, ought to recover the
value of the note at the time he chose to demand it ;
he has selected that time to call for his note and
to liquidate its value, and no other measure of dama-
ges short of that, will indemnify him for the loss of
the pledge ; I agree, therefore, on this ground to
the direction that was given.

These were all the points that were stated in the
case, or raised upon the argument ; and they being
with the plaintiff, I take it for granted, he is entitled
to judgment, and a new trial ought to be denied.